UNITED STATES of America, Plaintiff,

v.

Frank Javier CORDOBA, Defendant.

No. SA CR 95–39–GLT [SF].

United States District Court,
C.D. California.

Jan. 22, 1998.

Elizabeth Abrams, Asst. U.S. Atty., Los Angeles, CA, for Plaintiff.

Craig Wilke, Deputy Federal Public Defender, Santa Ana, CA, for Defendant.

## ORDER FINDING POLYGRAPH EVIDENCE INADMISSIBLE AND REINSTATING CONVICTION

TAYLOR, District Judge.

The court finds unstipulated polygraph evidence does not meet the *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) test for admission in evidence. The court finds polygraphy has not achieved general acceptance in the scientific community for courtroom use, the error rate for real-life polygraph tests is unknown, and there are no *controlling* standards for polygraphy.

### I. *BACKGROUND*

In 1995 police conducted a surveillance operation in Santa Ana, California, and observed a van pull into an alley and stop next to an open garage. A group of men watchfully loaded heavy objects from the garage into the van. Once loaded, the van was driven to a nearby shopping center and parked. Defendant appeared in the parking lot, climbed into the van's driver's seat, and drove away.

Shortly thereafter, police stopped the van and a search revealed three duffle bags and three cardboard boxes containing 300 kilograms of cocaine. Defendant was arrested and charged with possession of cocaine with intent to distribute.

Before trial, and without the government's knowledge, Defendant took a polygraph test concerning his insistence he had not known the van contained cocaine. The polygraph examiner used a Modified General Question Test designed to consist of four relevant questions, four irrelevant questions, and two control questions.[1] The examiner concluded Defendant was truthful in his responses to the four supposedly relevant questions.

The defense proposed to offer the polygraph evidence at trial. The government moved in limine to exclude it.

The general rule in the Ninth Circuit at that time was set forth in *Brown v. Darcy*, 783 F.2d 1389 (9th Cir.1986).[2] *Brown*, a civil case, established a *per se* rule that unstipulated polygraph evidence was inadmissible to establish the truth or falsity of a party's statement.[3] The Ninth Circuit had yet to comment on how *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113

S.Ct. 2786, 125 L.Ed.2d 469 (1993), affected *Brown's per se* rule. This court ruled it was controlled by *Brown*, and granted the government's motion to exclude the polygraph evidence.

At trial, Defendant testified he had not known the van contained cocaine. He said he believed the van contained the personal belongings of a Mr. Rodriguez, who had asked him to drive the van. Based on all the evidence, however, the jury found Defendant guilty of knowingly possessing cocaine with the intent to distribute, and he was sentenced to 262 months in prison.

On appeal the Ninth Circuit abandoned *Brown's per se* rule, and joined other Circuits in holding that, under *Daubert*, unstipulated polygraph evidence is not *per se* excluded. *United States v. Cordoba*, 104 F.3d 225, 230 (9th Cir.1997); *see, e.g., United States v. Pulido*, 69 F.3d 192 (7th Cir.1995); *United States v. Posado*, 57 F.3d 428 (5th Cir.1995) (*per se* exclusion reversed); *United States v. Piccinonna*, 885 F.2d 1529 (11th Cir.1989).[4]

The Ninth Circuit vacated the conviction and remanded, instructing this court to "conduct individualized inquiries under Rule 702 and 403 to determine whether Cordoba's un-

1. The Modified General Question Test is an application of the control question technique ("CQT"). A CQT examination asks three different types of questions: irrelevant, control, and relevant questions. Irrelevant questions are to ascertain the subject's chart readings when answering honestly. Control questions are related to the type of crime of which the subject is accused, and are designed to cause an untruthful response. Finally, relevant questions go directly to the issue at hand. The control question theory is that a truthful individual will likely show a stronger physiological reaction to the control questions, while a deceptive person is more likely to respond physiologically to the relevant questions. *See* Charles R. Honts & Bruce D. Quick, The Polygraph in 1995: Progress in Science and the Law, 71 N.D.L.Rev. 987, 987 (1995).

2. *Brown v. Darcy*, 783 F.2d 1389 (9th Cir.1986), was decided when admissibility of scientific evidence, was governed by *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923).

3. In the Ninth Circuit, *Brown per se* excluded most polygraph evidence. There were, however, at least three exceptions to the *per se* rule. First, "polygraph evidence might be admissible if it is introduced for a limited purpose that is unrelated to the substantive correctness of the results of the

polygraph examination." *United States v. Miller*, 874 F.2d 1255, 1261 (9th Cir.1989); *see also, United States v. Bowen*, 857 F.2d 1337, 1341 (9th Cir.1988). Second, in *United States v. Estrada-Lucas*, 651 F.2d 1261, 1264 (1980), the court accepted polygraph evidence admitted for the limited purpose of impeachment. Third, polygraph evidence has been found admissible in the penalty phase of a capital-murder trial. *Rupe v. Wood*, 93 F.3d 1434, 1441 (9th Cir.1996) (allowing the evidence on the issue of culpability and to refute a state assertion).

4. In November 1997 the Supreme Court heard arguments on whether *per se* exclusion of polygraph evidence is appropriate. *United States v. Scheffer*, —— U.S. ——, 117 S.Ct. 1817, 137 L.Ed.2d 1026 (1997) (concerning military courts' *per se* exclusion of polygraph evidence under Military Rule of Evidence 707, in review of *United States v. Scheffer*, 44 M.J. 442 (U.S.A.F.1996) (rejecting *per se* exclusion)). Although arising under military law, the impact of the Supreme Court's eventual *Scheffer* decision upon the federal courts will likely be significant because Military Rule of Evidence 702 is the same as Fed. R.Evid. 702, and military courts use *Daubert* to control the admissibility of scientific evidence. *See United States v. Buenaventura*, 40 M.J. 519 (A.C.M.R.1994).

stipulated polygraph evidence is admissible." *Cordoba*, 104 F.3d at 229. The Circuit left admission of the evidence to the discretion of the trial judge, but observed such evidence still "has grave potential for interfering with the deliberative process." *Id.* at 228. The Ninth Circuit concluded, should this court find the evidence inadmissible after conducting the inquiry, it may reinstate the judgment of conviction.[5]

Following the Ninth Circuit's remand order, this court conducted a two day evidentiary hearing, receiving detailed briefing from the parties. The court received testimony from highly-qualified witnesses on both sides of the issue. The centerpiece of the defense support for polygraph admission was the testimony of Dr. David Raskin, a pioneer psychophysiologist, nationally known scholar in forensic polygraphy, and generally acknowledged as the nation's foremost polygraph expert.[6] The matter was then submitted for decision.

## III. *DISCUSSION*

The court concludes the proposed unstipulated polygraph evidence is not admissible under both Federal Rule of Evidence 702 and 403.

**5.** Since *Cordoba*, the Ninth Circuit has issued one other polygraph opinion, *United States v. Croft*, 124 F.3d 1109 (9th Cir.1997). In *Croft* the court noted the district judge acted within discretion in denying Croft's motion for untimeliness, since "the government did not have a reasonable opportunity to have its own expert administer a test covering substantially the same questions—the measure identified by one circuit court ... as essential to safeguarding the interests of the opposing party." *Id.* at 1120 (citing *Piccinonna*, 885 F.2d at 1536 (11th Cir.1989)) (internal quotations omitted). Additionally, the court clarified that *per se* exclusion of unstipulated polygraph evidence is prohibited under the discretionary *Cordoba* review. *Id.* at 1120.

**6.** Dr. David Raskin, a former University of Utah professor, holds a Bachelor's, Master's and Ph.D from UCLA, and was a professor of psychology at the University of Utah from 1968 to 1995. He has devoted most of his career to conducting scientific research and publishing scholarly works on the polygraph technique. He has numerous publications in professional journals, papers presented at scientific meetings, and lectures on the subjects of psychophysiology and the polygraph technique. Many of his publications describe laboratory and field studies which he personally conducted to determine the validity of the polygraph technique. He is a member of

### A. *Federal Rule of Evidence 702*

Faced with an offer of expert scientific testimony, under Fed.R.Evid. 104(a) a trial judge must determine at the outset whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact in understanding or determining a fact in issue.[7] *Daubert*, 509 U.S. at 592. The preliminary assessment of whether the methodology underlying testimony is reliable "scientific knowledge" is determined by conducting the multi-factor review set forth in *Daubert*. Ultimately *Daubert* directed courts to consider whether a theory or technique can be tested, whether it has been subjected to peer review and publication, the known or potential rate of error, the existence and maintenance of standards controlling the technique's operation, and whether it is generally accepted within the relevant community. *Id.* at 592–595. The secondary determination, whether the testimony would assist the trier of fact, directs a trial court to evaluate whether the offered testimony is relevant. *Id.* at 591–92.

The reliability of polygraph testing fundamentally depends on the reliability of the

numerous professional and honorary organizations, including the Society for Psychophysiological Research and the American Psychology and Law Society. He was elected a fellow of the American Psychological Association, a fellow and charter fellow of the American Psychological Society, a fellow of the American Association for Applied and Preventive Psychology and president of the Rocky Mountain Psychological Association. He has testified about the polygraph in more than 150 trials. It is because of Dr. Raskin's superb qualifications that his testimony is so important in showing the *lack* of *controlling* standards in the polygraph field, as discussed below.

**7.** Rule 104(a) provides: "Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b) [pertaining to conditional admissions]. In making its determination it is not bound by the rules of evidence except those with respect to privileges." These matters should be established by a preponderance of the evidence. *See Bourjaily v. United States*, 483 U.S. 171, 175–176, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987).

protocol followed during the examination. After considering the evidence and briefing, the court concludes the proposed polygraph evidence is not admissible under Fed.R.Evid. 702. Although capable of testing and subject to peer review, no reliable error rate conclusions are available for real-life polygraph testing. Additionally, there is no general acceptance in the scientific community for the courtroom fact-determinative use proposed here. Finally, there are no reliable and accepted standards *controlling* polygraphy. Without such *controlling* standards, there is no way to ensure proper protocol, or measure the reliability of a polygraph examination. Without such standards, the proposed polygraph evidence is inadmissible because it is not based on reliable "scientific knowledge."

### 1. Testing

A scientific theory should be capable of being tested. *Daubert,* 509 U.S. at 593. The parties agree there is no known physiological response unique to deception which can be tested. David Raskin, *The Polygraph in 1986: Scientific, Professional and Legal Issues Surrounding Application and Acceptance of Polygraph Evidence,* 1986 UTAH L.REV. 29, 31 (finding there is "[n]o known physiological response or pattern of responses is unique to deception."). Proponents contend, however, the polygraph is testable because the body produces physiological reactions from which a trained polygraph examiner can draw inferences about truth and deception.

The premise underlying the polygraph has undergone testing in both laboratory and field settings. The laboratory studies create conditions which attempt to mimic experiences of real-life subjects. From a scientific viewpoint, laboratory studies can provide an ideal setting to study the reliability of polygraphs because "ground truth" (i.e., what is really true) is known. *See* T.D. Cook and D.T. Campbell, QUASI–EXPERIMENTATION: DESIGN AND ANALYSIS ISSUES FOR FIELD SETTINGS (1979) Field studies provide an alternative approach for studying polygraphs. Most often these studies use as subjects criminals who have confessed to a crime. The confession is used as the "ground truth" by which researchers measure the reliability of the polygraph.

Opponents have criticized the reliability of both laboratory and field tests. The Congressional Office of Technology Assessment ("OTA")[8] evaluated all of the available studies in 1983 and concluded "no overall measure ... [of polygraph validity] can be established based on available scientific testing." *See Scientific Validity of Polygraph Testing: A Research Review and Evaluation—A Technical Memorandum,* Office of Technology Assessment, at 4 (Nov.1983). Generally, opponents criticize testing for insufficient sample size and methodological shortcomings. *See generally* W. Iacono & D. Lykken, *The Scientific Status of Research on Polygraph Techniques: The Case Against Polygraph Tests,* 1 MODERN SCIENTIFIC EVIDENCE § 14–3 (D. Faigman et al. eds.1997). Specifically, opponents criticize laboratory and field studies for lacking realism and having limited applicability to real-life settings.[9] However, critics do not contest that some settings provide an effective forum to test whether a trained polygrapher can detect deception. In light of this, it appears the polygraph is a testable device.

### 2. Peer Review and Publication

"Submission to the scrutiny of the scientific community is a component of good science.... [P]ublication (or lack thereof) in a peer reviewed journal thus will be a relevant,

---

8. The Congressional Office of Technology Assessment ("OTA") is a non-partisan, non-political congressional support agency created by Public Law 92–484 to enable Congress to obtain competent, unbiased information concerning the physical, biological, economic, social, and political effects of technological applications. This is accomplished by the OTA providing legislative assessment of matters pending before Congress. OTA assessment is generally called for when the Federal Government may be asked to consider support for, or management or regulation of, technological applications.

9. For example, in laboratory tests, researchers question the suspects almost immediately after the "crime." In real-life, however, suspects are often not polygraphed until months, even years after the events in question. Correspondingly, the chief problem with field studies is researchers have no way to determine unambiguously who is in fact telling the truth.

though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised." *Daubert*, 509 U.S. at 593.

Hundreds of articles about the polygraph have been published, many in peer-reviewed journals.[10] The polygraph appears to meet the peer review factor of the *Daubert* analysis.

### 3. *Known or Potential Error Rate*

*Daubert* directs courts to consider the known or potential error rate of the scientific technique. *Daubert*, 509 U.S. at 594. Scientists supporting polygraph evidence have developed testing criteria which, if carefully followed, can produce accurate results. These high quality test studies suggest a properly conducted control question technique ("CQT") examination can have a 5 to 10% error rate.

On the other side, some studies indicate the potential error rate is, at best, unknown.

Eleven studies of polygraph evidence showed a wide range of accuracy rates—from 48% to 90%—with an average rate of 71%. Two critics have maintained the CQT approach is little better than "the toss of a coin." W. Iacono & D. Lykken, *The Scientific Status of Research on Polygraph Techniques: The Case Against Polygraph Tests, supra*, at 629. In the view of the OTA, "[o]verall, the cumulative research evidence suggests that when used in criminal investigations, the polygraph test detects deception better than chance, but with error rates that could be considered significant." [11] OTA Study at 5.

Opponents note the potential rate of error in real-life examinations is significantly higher compared to the high quality controlled situation testing which produced more accurate results. Real-life examinations are frequently not done as carefully as the high quality controlled tests. Moreover, real-life polygraphs can be susceptible to overly variable conditions,[12] countermeasures,[13] and

10. Studies on the polygraph have appeared in journals such as: The Journal of Applied Psychology, The Journal of General Psychology, Psychophysiology, The Journal of Police Science and Administration, Current Directions in Psychological Science, Psychological Bulletin, The Journal of Research in Personality, and Law and Human Behavior, to name a few.

11. A significant error rate does not necessarily mean evidence is inadmissible since there is no agreement over what range of error is acceptable. Under the multifactor *Daubert* analysis, courts need not determine a legal threshold where an error rate guarantees or bars admissibility. *See, e.g., Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1316 n. 3 (9th Cir.1995) ("These [Daubert] factors raise many questions, such as how do we determine whether the rate of error is acceptable, and by what standard?"). Instead, the court must decide what error rate should be tolerated given the value of a particular technique. *See e.g., United States v. Crumby*, 895 F.Supp. 1354, 1359–60 (D.Ariz.1995); Adina Schwartz, A "Dogma of Empiricism" revisited: Daubert v. Merrell Dow Pharmaceuticals, Inc. and the Need to Resurrect the Philosophical insight of Frye v. United States, 10 Harv. J.L. & Tech . 149, 237 (1997).

12. Opponents assert the conditions of each examination vary too widely to generalize about the real-life accuracy of the polygraph. OTA Study at 5. Factors such as sleep, coffee, and stress may alter test results on a given day. *Id.* Critics question whether the "fear of detection" will necessarily result in physiological reaction if,

for instance, an examination is given without the governments' knowledge. In such a "safe situation" the subject's fear and stress is reduced, thereby increasing his ability to beat the test. *Id.*

Supporters answer that the "safe situation" hypothesis has never been validated by any scientific study.

13. Opponents are concerned by the ability of subjects to use countermeasures to hinder the effectiveness of the examination. *See* Val Kalashnikov, *Beat the Box: The Insider's Guide to Outwitting the Lie Detector*.

Research indicates that if a person is given specific training by an expert on how to employ certain kinds of subtle and undetectable maneuvers ... a substantial proportion of them, possibly up to 50%, can produce an erroneous result on the polygraph test in a mock crime situation. Such maneuvers include unobtrusively biting the tongue ... or engaging in mental arithmetic during the control questions. With proper training, even experts cannot detect that the subject has been engaging in countermeasures.

Dr. Raskin's declaration, ¶ 22.

Supporters answer physiological responses are autonomic and, therefore, are relatively impervious to voluntary control. Additionally, without specialized training from an expert, they say attempts to defeat the test by countermeasures invariably fail in the laboratory tests. Finally, they argue opponents could best explore any problem with countermeasures in a given test through cross-examination.

subjectiveness.[14]

In sum, the court finds the error rate for high quality controlled (i.e., laboratory and field) polygraph studies is generally known and fairly low. However, the court finds the overall error rate is potentially significant, and the error rate for real-life polygraph tests is not known and is not particularly capable of analyzing. Whether the error rate in controlled studies can be transferred to real-life tests depends on the protocol and standards followed during the real-life test.

#### 4. General Acceptance in Scientific Community

Daubert notes "[w]idespread acceptance can be an important factor in ruling particular evidence admissible [or finding that] a known technique, which has been able to attract only minimal support within the community, may properly be viewed with skepticism." Daubert, 509 U.S. at 594 (citations omitted).

In urging polygraph evidence admissibility, Defendant notes three frequently-cited surveys which purport to show about two-thirds

of members of the Society for Psychophysiological Research accept the polygraph technique.[15] However, the poll results do not show general acceptance in the scientific community for courtroom use of polygraph evidence. Under the wording of the questions asked, about one-third said the polygraph was "of questionable usefulness, entitled to little weight against other available information." About two-thirds chose the answer that the polygraph "is a useful diagnostic tool when considered with other available information." The polls did not include an answer choice that the polygraph was acceptable for courtroom use or for determining the central, critical issue in a criminal case.[16]

The survey results are of little value in the Daubert analysis. The fact that two-thirds of respondents found the polygraph a "useful diagnostic tool" falls far short of finding it acceptable for courtroom use. These poll results appear merely to confirm the FBI's position that polygraph evidence is a useful "investigative technique," but is not reliable enough for courtroom evidence.

**14.** Critics argue the subjectiveness of the polygraph leaves the examination results vulnerable to manipulation.

Even the proponents of the polygraph technique agree that the examiner, and not the machine, is the crucial factor in arriving at reliable results. The examiner's expertise is critical in (1) determining the suitability of the subject for testing, (2) formulating proper test questions, (3) establishing the necessary rapport with the subject, (4) detecting attempts to mask or create chart reactions or other countermeasures, (5) stimulating the subject to react, and (6) interpreting the charts. 1 P. Giannelli & E. Imwinkelried, Scientific Evidence 218 (2d ed.1993). Thus, they argue, error rates are unreliable because examiners are conscious of who has hired them, and the opinion sought.

Supporters answer that all scientific analysis is, at some level, subjective, and the ability of a test to be corrupted does not weigh against the fact that, when done properly, a polygraph is reliable.

A factor undermining the acceptability of polygraph evidence in court is its analogous relationship to other scientific techniques that are regularly admitted into evidence. For example, in tests routinely admitted as reliable in the areas of fiber, blood, fingerprint, and voiceprint analysis, the examiner merely studies the physical characteristics of the physical evidence. In polygraphy,

however, the examiner must extrapolate a judgment of something not directly measured by the machine—the subject's credibility. See discussion at Meyers v. Arcudi, 947 F.Supp. 581, 588 (D.Conn.1996).

**15.** The three polls sampled a small segment of the relevant scientific community. The Society for Psychophysiological Research is a professional society of scientists (Ph.D. and M.D.) to study how the mind and body interact. A 1982 Gallup poll, published in 1984, was a telephone survey of 137 Society members. In 1991, Susan Armato received 136 returns from 450 inquiries sent to Society members to follow up on the 1982 survey. A 1993 Gallup repeat survey apparently involved a similarly small sampling.

**16.** The alternatives (and approximate response percentages over the four surveys) were that the polygraph was (a) "a sufficiently reliable method to be the sole determinant" (1%), (b) "a useful diagnostic tool when considered with other available information" (62%), (c) "of questionable usefulness, entitled to little weight against other available information" (34%), or (d) "of no usefulness" (1%). Because of the very generalized second response, permitting respondents to imagine whatever each might consider "useful" or "other available information," there is little wonder why the second response was most frequently selected.

There is considerable evidence of a lack of general acceptance in the scientific community for use of polygraph evidence where reliability of the results is critical, such as in courtroom, fact-determinative use.[17] Conflicting testimony at the evidentiary hearing demonstrated a lack of general acceptance. One of the most recent treaties on scientific evidence observes, "[s]cientific opinion about the validity of polygraph techniques is extremely polarized." 1D. Faigman et. Al., *Modern Scientific Evidence* § 14—1.4, at 565 n. (1997). In 1986, the American Psychological Association adopted a policy which called the reliability of polygraph test results "unsatisfactory." *Meyers v. Arcudi*, 947 F.Supp. 581, 587 (D.Conn.1996), cites two additional surveys, one showing only 36% of the relevant community agreed the control question technique of polygraphy was scientifically sound, while the other showed 69% believed the control question technique was not scientifically sound.

The court finds the polygraph has emerged as a useful technique for many diagnostic or investigative uses. However, the court finds there is no general acceptance in the scientific community for use of polygraph evidence when reliability is critical, as in courtroom fact determination.

### 5. *Controlling Standards*

The court is required to assess the existence *and* maintenance of standards *controlling* the polygraph's operation. *Daubert*, 509 U.S. at 594.[18] Where the error rate is dependant on the protocol during the scientific examination, the controlling standards analysis is particularly critical. *United States v. Chischilly*, 30 F.3d 1144, 1154 (9th Cir.1994).

For polygraphs, proper administration of the examination is essential to produce accurate results. Reliability depends upon the polygraph examiner properly conducting the pre-test interview, formulating the test questions, executing the test, and scoring the results.

No mandatory standards control the administration of polygraph examinations. While both the American Polygraph Association and the American Association of Police Polygraphists publish standards, neither organization has the authority to require members to comply with them. An estimated 2,000 polygraph examiners do not belong to either society. Moreover, there are no mandatory guidelines regarding the selection of polygraph examiners.

*Daubert*, however, does not require mandatory standards if standards "controlling" the polygraph's operation exist. *Daubert*, 509 U.S. at 594. The court has reviewed the following sources to determine if controlling standards exist: the American Association of Police Polygraphists List of Generalized Terminology and Procedures ("AAPP List"), the American Polygraph Association Code of Ethics Standards and Principles of Practice ("APA Code"), the Federal Bureau of Investigation's Manual chapter on conducting polygraph examinations ("FBI" Manual), the California Association of Polygraph Examiners Standards and Principles of Practice ("CAPE Standards"), New Mexico Evidence Code § 11–707, and Department of Defense Polygraph Institute ("DoDPI") Regulations. A review of these documents shows that, to the extent there are standards within the polygraph community, there are no controlling standards to ensure reliable polygraph results.

Three of the sources fail to set forth any standards controlling administration of poly-

---

**17.** Broad general acceptance of the polygraph as an investigative or hiring technique is not helpful here since a technique which is only partly reliable could still be generally accepted as useful for those purposes. *See i.e., Schall v. Lockheed Missiles & Space Co.*, 37 Cal.App.4th 1485, 1493, 44 Cal.Rptr.2d 191 (1995) (noting hypnotically refreshed memories are useful in therapy, but generally inadmissible in court). This court finds the relevant community must generally accept use of the polygraph in situations where reliability of results is critical. *See i.e., United States v. Solomon*, 753 F.2d 1522, 1526 (9th Cir.1985) (finding narcoanalysis not generally accepted, and thus inadmissible, because it does not induce reliable results).

**18.** *See* Margaret A. Berger, Procedural Paradigms for Applying the Daubert Test, 78 Minn. L.Rev. 1345, 1358–59 (1994) (noting "the court was concerned with how laboratory personnel carried out the scientific test in question, and not merely with ascertaining whether the test could provide results within a tolerable degree of error when the laboratory is working properly").

graph examinations. The AAPP submission opens with a statement by its Director of Quality Control that in twenty-fours years as a polygraph examiner "I have not seen [ ] a universally accepted set of standards to which we can readily adhere." AAPP List at 43. Instead of setting forth standards, the AAPP has only set forth "some generalized terminology and procedures." *Id.* The APA Code is equally vague. Members are directed to "use only those test techniques and question formats which are considered generally acceptable within the profession." APA Code at 2. Ethical guidelines, such as members shall "protect the privacy of each examinee," do not provide fixed standards on how to conduct a polygraph test. *Id.* at 3. Even the APA recognizes "these Standards and Principles of Practice establish *minimal guidelines* for the performance of professional activities." *Id.* at 4 (emphasis added). Similarly, the FBI Manual focuses on when a polygraph examination should be authorized or approved, without specifying how the examination should be conducted.

The CAPE and New Mexico sources do state some general guidelines. At best, however, they are generalized standards which fail to address the breadth of issues necessary to ensure reliability of a polygraph examination. The CAPE Standards generally require its members to use techniques which an accredited school has approved or are accepted by the polygraph community.[19] New Mexico Evidence Code § 11–707, which Dr. Raskin helped develop, specifies how much experience an examiner must have and that the examination must be taped. Beyond these details, New Mexico simply counsels

examiners to follow generally accepted principles, and does not state what those principles are.[20] The standards set by these organizations fall short of fixing a controlling industry standard for purposes of this *Daubert* analysis.

Finally, the DoDPI regulations are by far the most extensive collection of standards. The DoDPI has developed specific policies on the selection, training and supervision of examiners. It has published detailed rules which specify how the polygraph instrument should be maintained, pre-test interviews should be conducted, and test questions should be structured and sequenced. The DoDPI has produced comprehensive instructions on how the chest and stomach pneumograph, galvanograph sensitivity, cardio pressure, and other items should be calibrated and scored. The DoDPI, however, recognizes these standards are not controlling. "Neither the Federal Government nor the American Polygraph Association have formally established standards for use within their own organizations ... [it is merely] custom or habit to follow the teachings of the DoDPI." DoDPI Test Data at 1.

Reading the sources together does not create a controlling industry standard. It creates a picture of disagreement. For instance, the Department of Defense Polygraph Institute teaches that, if a subject fails one relevant question, the subject fails the entire test. Dr. Raskin, however, follows a standard where a subject who fails one relevant question may still pass the test. Under New Mexico Rule of Evidence 11–707, a polygraph examination must be recorded.

---

**19.** CAPE directs no member shall render a conclusive opinion unless it is supported by two polygraph charts, each of which conforms to a standardized polygraph technique as taught at an accredited school or accepted by the polygraph community. Cape Standards at 37. Additionally, CAPE directs the polygraph must be capable of "accurately, separately and simultaneously recording the tidal volume of the examinee's lungs, the examinee's galvanic skin response and the examinee's pulse rate and relative blood pressure." *Id.* at 39.

**20.** Under Rule 11–707 to be qualified as an expert witness a polygraph examiner must have at least five years' experience and have successfully completed at least twenty hours of continuing education in the field of polygraph examinations

during the previous twelve month period. "[T]he opinion of a polygraph examiner may in the discretion of the trial judge be admitted as evidence" if the examination was performed by a person who is qualified and if: (1) the polygraph examination was quantitatively scored in a manner generally accepted as reliable by polygraph experts; (2) prior to conducting the polygraph examination the polygraph examiner was informed as to the examinee's background, health, education and other relevant information; (3) at least two relevant questions were asked during the examination; and (4) at least three charts were taken of the examinee. Additionally, the pre-test interview and actual testing shall be recorded in full on an audio or video recording device. N.M.R.Evid. 11–707 (Michie 1997).

Dr. Raskin, however, follows a standard where an unrecorded exam is appropriate.

No controlling standard is set forth by any of the professional associations, and there are great differences in "generally accepted principles." An offer of conflicting standards is not helpful. The court is not called upon to choose which standards should control. Rather, the court must find whether the industry *has* controlling standards against which the quality of Defendant's examination can be measured. The evidence presented to the court demonstrates that there are no *controlling* standards in the polygraph industry.[21]

The lack of sufficient controlling industry standards was illustrated by the testimony of Dr. Raskin, the renowned polygraph expert, on the acceptability of Defendant's polygraph test. Despite numerous serious shortcomings in the administration of Defendant's test, Dr. Raskin found it to be completely acceptable under industry standards.

The evidence showed, and the court finds, Defendant's test contained many factors which would be considered defects under various versions of industry "standards." The duration and substance of the pre-test interview was not preserved. No tape or video was made of the pre-test interview or the polygraph exam. The examiner didn't calibrate the machine at the prison test site. Although the examiner asked four supposedly "relevant questions," only one was really relevant: two involved undisputed facts, one was marginally relevant, and the wording of the truly relevant question was arguably too ambiguous to be helpful. The examiner found deception in the marginally-relevant question's answer (while Dr. Raskin did not), but the examiner scored it as truthful after obtaining Defendant's explanation for the answer. The examiner's report was filled with errors and defects: the report was drafted before the test, it did not include a fingertip test, according to Dr. Raskin it lacked atten-

tion to detail, it omitted Defendant's response to whether he was under drugs or medication, it misstated the machine used, and it says the stimulation test was done after the first test when it was actually done first. Although there was movement on a response, the examiner scored the response. The examiner did not record a significant breath. The examiner did not ask if Defendant had proper sleep before the exam. The examiner acknowledged the exam was conducted in a poor setting with many distractions.

Although each of these occurrences is a defect under various expressions of the industry's standards, Dr. Raskin declined to criticize Defendant's test in any meaningful way, and found the test to be entirely acceptable. Confronted with each defect, Dr. Raskin staunchly stuck to his view that the test was reliable and acceptable. He acknowledged each item, but declared each to be no defect or of little significance and within acceptable limits.

It was apparent to the court that the test was not performed within acceptable limits.[22] The blanket and non-critical approval of Defendant's test by Dr. Raskin, who is probably the strongest and best informed advocate for polygraph admissibility, illustrates that the polygraph industry lacks sufficient *controlling* standards to satisfy *Daubert*. If pro-polygraph's best expert declines to find any fault with an obviously faulty examination, that is strong evidence that there are insufficient controlling standards.

### 6. *Evaluation*

The court has carefully evaluated the proposed polygraph evidence under *Daubert*. The polygraph has been extensively tested, and has been the subject of extensive peer review and publication. While probably accepted in the scientific community as a useful diagnostic or investigative technique, it does

---

21. *But see, United States v. Galbreth,* 908 F.Supp. 877 (D.N.M.1995) (finding sufficient industry standards because New Mexico has stringent licensing regulations which ensure polygraph examiners will be qualified to competently administer polygraph tests and noting Dr. Raskin, the examiner in the case, was licensed in New Mexico).

22. The government's evidence at the hearing was persuasive that each of these items was a defect and, taken together, rendered Defendant's test defective and unreliable.

not have "general acceptance" for use as courtroom evidence. The known or potential error rate of real-life polygraph tests is unknown, and fundamentally depends on the protocol followed during a particular examination. The court finds there are no *controlling* standards to ensure proper protocol or provide a court with a yardstick by which a particular defendant's examination can be measured.

For these reasons, the court finds polygraph evidence does not presently satisfy the *Daubert* standards, and Cordoba's unstipulated polygraph evidence is inadmissible.

### B. *Federal Rule of Evidence 403*

■ Assuming the polygraph evidence were admissible under Fed.R.Evid. 702, the inherent unreliability of the particular examination performed in this case makes it inadmissible under Fed.R.Evid. 403. If its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury," evidence is barred. Fed.R.Evid. 403; *United States v. Rincon,* 28 F.3d 921, 925 (9th Cir.), *cert. denied* 513 U.S. 1029, 115 S.Ct. 605, 130 L.Ed.2d 516 (1994) ("Daubert in no way altered the discretion [under Rule 403] that resides with the district court judge to determine whether such evidence is properly admitted.").

Defendant's polygraph results would be relevant for various reasons. Here, however, the questionable reliability of Defendant's polygraph evidence undermines its relevance, and the potential prejudice substantially outweighs its probative value. A valid concern is that this evidence might likely mislead the jury. The reasoning in *Brown* endures on this point:

> Even if the accuracy of polygraph examinations approaches the eighty percent or ninety percent claimed by the polygraph experts, [the] view of the polygraph as an absolute indicator of truth creates an overwhelming potential for prejudice when inaccurate results are introduced.

*Brown,* at 1396. This concern is heightened here where the court has found the poly-

graph test administered to Defendant was defective. *See United States v. Kwong,* 69 F.3d 663, 668 (1995) (finding that ambiguous questions made the results inaccurate and created "a substantial possibility that the admission of the polygraph results would mislead and confuse the jury").

In this case the defense was based on Defendant's testimony that he did not know there was cocaine in the van. Under these circumstances, defective polygraph evidence offered to bolster the defendant's credibility is extremely prejudicial. *See United States v. Sherlin,* 67 F.3d 1208, 1217 (finding "the use of a polygraph solely to bolster a witness' credibility is highly prejudicial, especially where credibility issues are central to the verdict."). The polygraph testimony would be tantamount to testimony regarding the defendant's guilt or innocence. *See United States v. Alexander,* 526 F.2d 161, 167–68 (8th Cir.1975) (finding the distinction between an expert's opinion as to truth or falsity of responses and guilt or innocence is illusory). The flawed examination here creates a substantial possibility the jury would be misled. The substantial possibility of prejudice outweighs the probative value of the polygraph evidence. *See, e.g., United States v. Call,* 129 F.3d 1402, 1405 (10th Cir.1997) (finding the district court properly excluded the polygraph evidence under Rule 403); *United States v. Williams,* 95 F.3d 723 (8th Cir.1996); *Sherlin,* 67 F.3d at 1216–17; *Posado,* 57 F.3d at 435 (suggesting an "enhanced role" for Rule 403 may be appropriate due to the possible prejudicial effect of polygraph evidence). This court finds the Defendant's polygraph evidence is inadmissible under Rule 403.[23]

### III. *DISPOSITION*

■ The Ninth Circuit instructed that, if this court found the polygraph evidence inadmissible, it may reinstate the judgment of conviction. *Cordoba,* 104 F.3d at 229–30. This court finds the Cordoba unstipulated polygraph evidence inadmissible under both Fed.R.Evid. 702 and 403.[24] The judgment of conviction is reinstated.

---

**23.** The government has also opposed the admissibility of polygraph evidence under Fed.R.Evid. 608(b) (hearsay) and 704 (ultimate issue testimony). This court does not reach those issues.

**24.** The polygraph evidence is not admissible un-

der the Defendant's Sixth Amendment right to present relevant testimony. That right is not without limitation. "The right may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Michigan v. Lucas*, 500 U.S. 145, 149, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991) (quoting *Rock v. Arkansas*, 483 U.S. 44, 55, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987)). Here, the defendant's Sixth Amendment rights must be weighed against the government's legitimate interest in excluding inherently unreliable evidence. *See Chambers v. Mississippi*, 410 U.S. 284, 295, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). Since the Defendant's polygraph evidence is unreliable, the defendant does not have a constitutional right to present it.