**Barbara MEYERS, Plaintiff,**

v.

**Joseph P. ARCUDI, et al., Defendants.**

**Civil No. 3:95CV223 (PCD).**

United States District Court,
D. Connecticut.

Dec. 6, 1996.

J. Daniel Sagarin, Margaret E. Haering, David A. Slossberg, Hurwitz & Sagarin, Milford, CT, for Plaintiff, Barbara Meyers.

Raymond J. Plouffe, Jr., Bai, Pollock & Coyne, Bridgeport, CT, Richard J. Buturla, Brian A. Lema, Warren L. Holcomb, Berchem, Moses & Devlin, P.C., Milford, CT, for Defendant, Joseph P. Arcudi.

Stephen P. Fogerty, Robert Avery Rhodes, Halloran & Sage, Westport, CT, for Defendant, Andrew F. Fink.

Thomas P. O'Dea, Jr., Halloran & Sage, Westport, CT, Deborah L. Bradley, Meriden, CT, for Defendant, Town of Westport.

### RULING ON MOTION IN LIMINE

DORSEY, Chief Judge.

Plaintiff alleges violation of Title VII of the Civil Rights Act of 1964 (as amended), 42 U.S.C. §§ 2000e *et seq.*, 42 U.S.C. §§ 1983 and 1985, and state common law. Plaintiff seeks admissibility of a polygraph test which purportedly sustains her credibility, crucial to her case. She offers affidavits of Victor Kaufman ("Kaufman") and Frank S. Horvath, Ph.D. ("Horvath") to support her contention that expert testimony based on a polygraph test should be admitted. Defendant offers the affidavit of William G. Iacono, Ph.D. ("Iacono") in opposition.

## I. BACKGROUND

Plaintiff alleges, *inter alia*, that, beginning in 1993, defendant Arcudi sexually harassed and intimidated her. Plaintiff alleges that the harassment continued after he became plaintiff's employer. Defendant denies the allegations.

Before commencing this lawsuit, plaintiff underwent a polygraph examination. Defendants did not receive notice of the test. Using the control question technique ("CQT"), Kaufman asked plaintiff the following questions, which he concluded she answered truthfully:

Q: Did Joseph Arcudi, against your will, place your hand on his penis?

A: YES.

Q: Did Joseph Arcudi, against your will, push your head toward his naked penis?

A: YES.

Q: Did you ever, for the purpose of sex, invite Arcudi to your home?

A: NO.

Plaintiff seeks to introduce these results to corroborate her claims.

## II. DISCUSSION

### A. *Daubert*

Before *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the test for admissibility of expert opinion evidence was whether the scientific technique on which the evidence was founded was "generally accepted in the relevant scientific community." *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). *Daubert* rejected that test in view of the intervening adoption of Fed.R.Evid. 702, a more liberal standard of admissibility. *Daubert*, 509 U.S. at 589, 113 S.Ct. at 2794–95.

"That the Frye test was displaced by the Rules of Evidence does not mean, however, that the Rules themselves place no limits on the admissibility of purportedly scientific evidence." *Id.* at 589, 113 S.Ct. at 2795. *Frye* permitted deference to the relevant scientific community in deciding admissibility of expert testimony. *Daubert* requires application of the Rules and a determination whether the proffered evidence is relevant and reliable. *Id.*

The reliability analysis for expert opinion evidence admissibility mandated by *Daubert* starts with Fed.R.Evid. 702, which provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise."

The polygraph evidence is not claimed to be technical or otherwise specialized, but grounded in scientific knowledge. To be "scientific," evidence must be grounded "in the methods and procedures of science." *Daubert*, 509 U.S. at 590, 113 S.Ct. at 2795. The term "knowledge" " 'applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds.' " *Id.* (quoting Webster's Third New International Dictionary 1252 (1986)).

Although these standards reflect that the term "scientific knowledge" involves more than speculation and objective opinion, scientific testimony is not required to be "known" to a certainty. *Daubert*, 509 U.S. at 590, 113 S.Ct. at 2796. Rather, it is subject to an ongoing process by which it is reinforced, modified or replaced. It is not absolute, but everchanging. *Id.* Therefore, to qualify as "scientific knowledge," the proposed testimony must be based on the scientific method. *Id.*

Rule 702 also requires that the expert testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." This requirement is essentially a relevance inquiry. *Id.* at 591, 113 S.Ct. at 2795. Thus, the testimony must not only be based on valid scientific theory, but must also relate to an issue in the case. *Id.*

### B. *Second Circuit and Scientific Evidence*

The Second Circuit, prior to *Daubert*, departed from a strict application of the *Frye* general acceptance test, though, as in *Dau-*

*bert,* acceptance of the proffered evidence in the scientific community has been a considered factor. *United States v. Williams,* 583 F.2d 1194 (2d Cir.1978), *cert. denied,* 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979); *See United States v. Jakobetz,* 955 F.2d 786, 794 (2d Cir.1992), *cert. denied,* 506 U.S. 834, 113 S.Ct. 104, 121 L.Ed.2d 63 (1992) (noting that the Second Circuit was one of the first jurisdictions to abandon *Frye* in favor of the permissive approach of the Federal Rules of Evidence). After *Williams,* the Second Circuit twice sustained District Court exclusions of polygraph evidence for want of demonstrated reliability. *United States v. Bortnovsky,* 879 F.2d 30, 35 (2d Cir.1989); *United States v. Rea,* 958 F.2d 1206, 1224 (2d Cir.1992) (referring to absence of demonstrated reliability and relevance of polygraph evidence in record, as later mandated to be considered in *Daubert*). Therefore, defendants argue that under the standard later enunciated in *Daubert,* the Second Circuit has already found polygraph evidence inadmissible under Rule 702. *See United States v. Lech,* 895 F.Supp. 582, 585 (S.D.N.Y.1995) (noting that defendant's argument that *Rea* and *Bortnovsky* must be revisited in light of *Daubert* was tenuous, as the Second Circuit found in *Williams* that a determination of admissibility of scientific evidence should be made under the Federal Rules).

However, the Second Circuit recently declined to address the application of *Daubert* to polygraph evidence, while at the same time implying that the "proper opportunity to explore the validity of polygraph evidence under Rule 702" might arise under the appropriate circumstances in the Second Circuit. *United States v. Kwong,* 69 F.3d 663, 668–69 (2d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1343, 134 L.Ed.2d 491 (1996).[1] In *Kwong,* the Second Circuit found that the polygraph evidence at issue would not assist the jury and, furthermore, that the ambigui-

ty of the questions asked of the witness might mislead and confuse the jury, outweighing any probative value of the evidence. *Id.* at 668. The court therefore found it unnecessary to open the "legal Pandora's box" of polygraph evidence admissibility under the *Daubert* standard. *Id.* at 668.

*Kwong* did not acknowledge the fact that before *Rea* and *Bortnovsky* were decided, the Second Circuit rejected *Frye* for the more liberal Federal Rules standard later adopted in *Daubert.* This could be a result of the fact that some of the cases upon which *Rea* and *Bortnovsky* relied were decided pre-*Daubert* without obvious analysis of the *Daubert* factors. *See Bortnovsky,* 879 F.2d at 35 (relying, in part, on *Brown v. Darcy,* 783 F.2d 1389, 1394–95 & n. 11 (9th Cir. 1986) and *Barrel of Fun, Inc. v. State Farm Fire & Casualty Co.,* 739 F.2d 1028, 1031 (5th Cir.1984)). Furthermore, it does not appear that the records in *Rea* and *Bortnovsky* were fully developed to sufficiently allow determination of the reliability of the proffered polygraph evidence under the more liberal admissibility standards. Therefore, it is appropriate to determine the reliability of the polygraph evidence in this case as mandated by *Daubert.*

### C. *Daubert Analysis of Proffered Polygraph Evidence*

*Daubert* outlined a non-exhaustive list of five factors to be considered when determining the reliability of scientific evidence: (1) whether the theory or technique on which the evidence is based can be (and has been) tested; (2) whether the theory or technique has been subject to peer review or publication; (3) the known or potential rate of error; (4) whether standards controlling the technique's operation exist and are maintained; and (5) the extent to which the theory or technique has received general acceptance. *Daubert,* 509 U.S. at 593–94, 113 S.Ct. at

---

**1.** Using the *Daubert* standard, courts in other Circuits have found polygraph evidence admissible. *See United States v. Galbreth,* 908 F.Supp. 877 (D.N.M.1995); *United States v. Crumby,* 895 F.Supp. 1354 (D.Ariz.1995) (admissible subject to limiting requirements); *Ulmer v. State Farm Fire & Cas. Co.,* 897 F.Supp. 299 (W.D.La.1995). The Fifth Circuit, in *United States v. Posado,* 57

F.3d 428 (5th Cir.1995), while not finding on the record before it that polygraph tests were sufficiently reliable to be admitted, struck down the Fifth Circuit's *per se* rule against admitting polygraph evidence, and remanded the case for consideration of admissibility under the *Daubert* standard.

2796–97. Additional factors considered in the Second Circuit include: (1) whether the technique is subject to abuse; (2) whether it is analogous to scientific techniques and results held to be admissible; and (3) whether "fail-safe" characteristics are present. *Williams*, 583 F.2d at 1199.

### 1. *The Experts*

Kaufman, the examiner who tested plaintiff, is offered by plaintiff as an expert in the administration and interpretation of polygraphs and thus qualified to offer an opinion as to plaintiff's truthfulness as to the incident at issue. His affidavit outlines his training and experience in the administration and interpretation of polygraphs.

Plaintiff also relies on Horvath, a criminology and criminal justice Ph.D. with a cognate in psychophysiology. He demonstrates substantial training and experience in administration and interpretation of polygraphs. He has not only had substantial experience in the practical testing and use of test results, but in teaching and writing on the methodology, efficacy and validity of polygraph testing. He offers no evidence on the interpretation on plaintiff's test, but rather opines on the reliability of CQT polygraph testing.

Defendants present Iacono, a Ph.D. in clinical psychology, as an expert to counter the opinion of Horvath as to the reliability of CQT. He has researched and written on the validity of polygraphy and is qualified comparably to Horvath.

### 2. *Control Question Polygraph Examination*

■ The polygraph instrument accepted today, and used in the examination of plaintiff, measures four physiological functions. The basic components are the cardiograph, which monitors changes in blood volume and heart rate; the pneumograph, which monitors respiratory activity, in both the abdominal and thoracic area; and the galvanograph, which records the changes in resistance to electrical current on the surface of the skin. Changes in the physiological measurements are transmitted to pens which record them on moving chart paper.

These devices do not detect lying. Rather, they measure physiological changes claimed to occur when answering questions. The theory is premised on human aversion to stating a falsehood. A spoken falsehood allegedly causes a psychological response and in turn, physiological reactions. The theory concludes that a lie precipitates an alteration in the rate and pattern of breathing, blood pressure, rate and volume of blood flow, and the moisture on the skin. Truthful answers do not precipitate the same reactions.

The CQT method, which Kaufman used to test plaintiff, measures the truthfulness or deception of a person on a specified issue by evaluating the physiological response to relevant, or incident-specific, questions and control questions.[2] During a pre-test interview, the examiner explains the nature of the polygraph instrument, the purpose of the testing and the pertinent issues. The questions to be asked are jointly formulated by the examiner and the examinee. The incident-specific questions focus on the incident under investigation, *e.g.*, "Did you steal that $500?" The incident-specific questions asked of plaintiff are those noted previously.

The unrelated control questions are not directly related to the offense at issue, but rather deal with issues related to the motive for the offense. They do not encompass a specific time period. These questions are developed with each subject and their specific form and content is determined between the examiner and the subject. The object is to develop questions to which the subject is led to answer "no," but will doubt the truthfulness or accuracy of the answer. In a theft, the control question might be: "Besides that bicycle you told me about, did you ever steal anything else?" The control questions asked of plaintiff included: "Before 1993, did you ever do any sex act you are now ashamed of?" and "Before 1993, did you ever do any not normal sex act?"

The theory assumes that persons who are truthful regarding the relevant incident-spe-

---

**2.** There is no dispute that Kaufman's examination of plaintiff complied with standard procedures for CQT testing.

cific test questions are more concerned about broader control questions not related to the particular incident at issue, about which they have doubts. The theory concludes that truthful examinees will have greater physiological responses to the control questions than to the relevant questions. Deceptive persons, it is assumed, will be more concerned with relevant questions than about the control questions. Therefore, stronger physiological responses to control than to relevant questions leads an examiner to conclude that an examinee is being truthful about the incident-specific relevant questions; conversely, stronger physiological responses to incident-specific questions lead an examiner to conclude that an examinee is deceptive regarding the incident-specific questions. The theory relies in part on examinees' substantially uniform adversity to falsehood.

Each instrument's sensors measure the physiological changes which are transmitted to the recording device, a moving graph paper on which a stylus records the degree of change for each question. The resulting graph is interpreted by comparing the physiological changes when relevant questions were answered with changes when control questions were answered.

Three tests are conducted. The comparisons are point-scored. The examiner compares the reactions to the control questions versus the reactions to the relevant questions. There are two types of scoring methods. For the seven-point scale (with a range of $-3$ to $+3$), if the reaction to the control question is greater than the reaction to the relevant question, the reaction is assigned a positive value on a scale of 1 to 3. If the reaction to the control question is smaller than the reaction to the relevant question, then the reaction is scored a negative value of 1 to 3. If there is no difference, a score of 0 is assigned.

The three-point method compares the responses to the control and to the relevant questions, valued at either $-1$, 0, or $+1$. This method avoids the examiner's subjective judgment about the extent of the difference between relevant and control questions responses.

Once all questions have been scored for all physiological factors, the scores are summed across all measures and the three tests. For the seven-point scale, a score $+6$ or higher deems an examinee is truthful, or $-6$ or lower deems an examinee to be deceptive. For the three point scale, the scores are $+3$ or higher for truthfulness, and $-3$ or lower for deception. Scores between these boundaries are deemed inconclusive.

Mr. Kaufman scored plaintiff's test at $+13$ on the seven-point scale, and $+7$ on the three-point scale. He therefore concludes that plaintiff was truthful in her responses.

3. *Daubert and Other Reliability Factors*

 a. *Whether Theory or Technique Can Be (or Has Been) Tested*

The first factor to be addressed is whether the theory can be or has been tested. Horvath indicates that in the last twenty-five years, researchers have carried out substantial scientific research to test the accuracy of CQT. (Horvath Aff. at ¶ 25.) Horvath identifies three types of tests: (1) laboratory-based studies; (2) blind review studies; and (3) field true validity studies. (Id. at ¶ 26.) However, the legitimacy of the results of these tests is not clear.

The laboratory-based studies generally involve selection of a group, some of whom commit mock crimes and others who do not. A polygraph test is then administered. Those who commit the crimes are asked to lie. (Id. at ¶ 27; Iacono Aff., Ex. A at 36.) Subjects in these studies are offered money if they can be classified as truthful on the CQT. (Iacono, Ex. A at 36.)

Iacono challenges the validity of these tests for four reasons. First of all, he asserts that the subjects are unlikely to represent real-life criminal suspects. (*Id.*) Secondly, he claims that subjects' concerns regarding the mock crimes and the lies they are instructed to tell do not assuredly mirror real-life concerns. (Id.) Thirdly, he claims that the subjects are unlikely to be as apprehensive about crimes for which they will not be punished. (Id.) Lastly, he asserts, polygraph tests in the laboratory studies are dissimilar to real life exams. For example, laboratory subjects are typi-

cally tested immediately after the crime, unlike in real-life. Moreover, researchers attempt to standardize the procedures. For example, all subjects are asked identical questions, unlike real life. (Id.)

The blind review studies use confessions subsequent to the polygraph examinations to determine ground truth. (Horvath at ¶ 30.) The field true validity studies involve review of real-life case files by attorneys and investigators. (Horvath at ¶¶ 33–34.) The difficulty in these studies, determining "ground truth," however, creates a fundamental flaw in the scientific validity of these studies. (Iacono, Ex. A at 29.) As for the blind review studies, Iacono claims that they systematically eliminate tests with errors and include only those where the original examiner was shown to be correct. For example, the only cases selected are those with a guilty suspect who failed a test and subsequently confessed. Thus, the polygraph tests in which an innocent person failed, and in which a guilty subject passed would be excluded in the study. Such elimination could lead to a skewing of the results of the study which may systematically overestimate the accuracy of the exam in determining deception or truthfulness. (Iacono, Ex. A at 30.)

Furthermore, in the field true validity studies, the real-life cases are reviewed by attorneys and investigators who are offering their subjective determination of the truth. Therefore, it is difficult, if not impossible to determine what is the "ground truth."

Accordingly, while the accuracy of the CQT polygraph exam has been tested, there are serious flaws which may underestimate the error rates. Therefore, this factor weighs in favor of excluding the polygraph evidence.

### b. Peer-Review and Publication

The CQT has been the subject of extensive peer-review and publication. Many of these articles have either been published in journals subject to peer-review or have been carefully examined by the scientific community. However, as noted above, the results of the studies may be flawed and inaccurate. Furthermore, even if a theory or technique is subject to publication and peer-review, it does not necessarily follow that it is scientifically valid. In fact, as the Supreme Court noted, the peer-review and publication process scrutiny is "'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected." Daubert, 509 U.S. at 593, 113 S.Ct. at 2797. Furthermore, although plaintiff offers evidence of peer-review, as noted below, it does not appear that the CQT has gained general acceptance in the scientific community. Therefore, this factor is not dispositive in the question of admissibility.

### c. Known or Potential Rate of Error

The third factor to be determined is whether there is a known or potential rate of error for the CQT. By averaging the results of all the scientific research on the CQT, Horvath estimates that the accuracy of the technique is approximately 90%. (Horvath at ¶ 38.) However, this figure takes into account all of the studies, which, as analyzed previously, may have overly inflated accuracy rates. Therefore, an accurate potential rate of error is undetermined, and this factor weighs in favor of excluding the polygraph evidence.

### d. Standards Controlling Technique's Operation

The fourth factor to be considered is whether standards controlling the CQT exist and are maintained. Standards for test development, administration and evaluation for the certification of examiners are in place. Examiners trained in numerical scoring are consistent in scoring the same polygraph readings. However, defendants' evidence raises substantial questions about the validity of the polygraph test. Therefore, although this factor weighs in favor of admission of the reliability of the polygraph evidence, it is not determinative of admissibility.

### e. General Acceptance

The fifth factor to be considered is general acceptance in the relevant scientific community. There is dispute as to what field is the relevant scientific community to which polygraphy belongs. Iacono contends that the relevant community should be psychologists, as polygraph interrogation is a form of applied psychology. (Iacono, Ex. A at 14–15.)

He cites a survey of psychophysiologists, a significant subset of the psychological community, which he conducted with David T. Lykken, Ph.D. In this survey, only 36% agreed that the CQT was scientifically sound, and approximately 75% disagreed that the CQT was at least 85% accurate. (Iacono, Ex. A at 44–46.) In another survey of psychologists, 69% believed that the control question technique was not scientifically sound and 80% disagreed that the technique was standardized. (Iacono, Ex. A at 47–48.)

■ Plaintiff's expert, on the other hand, contends that practitioners are the relevant scientific community and cites a survey of practitioners who estimated the accuracy of the control question technique to be between 86% and 100%. (Horvath at ¶ 41.) Those who administer the exam are not the relevant scientific community. Many of them, indeed, do not even possess advanced degrees and are not trained in the scientific method. He conclusorily states, in any event, that if one were to identify the academic community as the relevant scientific community, it is overwhelmingly in favor of the use of the polygraph. (Id. at ¶ 42.)

Horvath also asserts that a significant number of federal and state police agencies and intelligence agencies use the polygraph to screen applicants for police work and for investigative purposes. (Horvath at ¶¶ 43–45.) However, it does not necessarily follow that these uses of the polygraph indicate that the polygraph is sufficiently reliable to be admitted into court. In fact, according to the Chief of Polygraph at the FBI, the United States Department of Justice and the FBI oppose any attempt to enter results of polygraphs at trial because the technique has not reached a level of general acceptance in the scientific community and no existing uniform standards exist for training or conducting the examinations. (Iacono, Ex. D.)

Based on the above contradictions, it is not clear that the control question technique has reached a level of general acceptance in the scientific community, and this factor weighs against admission of the polygraph evidence.

### f. *Other Factors*

Other factors militate against admission of polygraph evidence. For example, one factor that the Second Circuit has considered is a technique's analogous relationship with other scientific techniques and results that are regularly admitted into evidence. In *Williams,* the court drew a distinction between polygraphy and spectrography, which was deemed admissible.

> In spectrography, the examiner merely compares spectrograms reflecting the purely physical characteristics of a voice. In polygraph analysis, the examiner must go on, to extrapolate a judgment of something not directly measured by the machine, *i.e.,* the credibility of the person examined.... The skill of the polygraph examiner, the kinds of questions asked, natural variations in blood pressure among individuals, and in how accustomed they are to lying, are unpredictable variables that made the polygraph technique far more speculative than is spectrograph analysis.

*Williams,* 583 F.2d at 1199 n. 9 (citations omitted). The same comparison can be made to other techniques that are often admitted as reliable, *e.g.,* drug, soil, fiber and blood analysis, in which the researcher merely studies the physical characteristics of the physical evidence.

The above discussion demonstrates some support for polygraph evidence, but under the reliability analysis mandated in *Daubert,* it is not deemed sufficient and the polygraph evidence is not found to be reliable.

### 4. *Relevance*

■ As earlier noted, Rule 702 also requires that the proffered evidence "assist the trier of fact to understand the evidence or to determine a fact in issue." Therefore, in the alternative, if the CQT polygraph test is determined to be reliable, further consideration would have to be given to the relevance of the proffered evidence.

Unquestionably, plaintiff's credibility will be crucial. Her claim of Arcudi's misconduct is vital to her proof of defendants' liability. Arcudi denies her version of his conduct. The jury will necessarily have to determine

whether to credit plaintiff's story or not. Accordingly, evidence bearing on her credibility would be relevant. See Fed.R.Evid. 401.

5. *Federal Rule of Evidence 403*

 If polygraph evidence is determined to meet the requirements of Rule 702, it must also meet the test of Fed. Rule Evid. 403, *see Kwong,* 69 F.3d at 669, which provides in part that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." For several reasons, the probative value of the proffered evidence is substantially outweighed by potential prejudice, and thus, the evidence is also excludable on this basis.

In considering the balance between the probity of the evidence and its potential for prejudice, caution has been expressed due to its "aura of infallibility" and conclusiveness to a jury. *Brown v. Darcy,* 783 F.2d 1389, 1394 (9th Cir.1986); *United States v. Crumby,* 895 F.Supp. 1354, 1363 (D.Ariz.1995).

Two potential prejudicial factors were identified in *Posado* which are present here. First of all, the Fifth Circuit noted that the prosecution in *Posado* was contacted before the tests were conducted and had the opportunity to participate in them. Thus, "both parties [had] a risk in the outcome of the polygraph examination, simultaneously reducing the possibility of unfair prejudice and increasing reliability." *Posado* at 435. Defendants here were neither contacted before the exam nor invited to participate. Therefore, the potential for prejudice is great. *See United States v. Sherlin,* 67 F.3d 1208, 1217 (6th Cir.1995), *cert. denied,* — U.S. —, 116 S.Ct. 795, 133 L.Ed.2d 744 (1996) (not abuse of discretion to exclude polygraph test of which prosecution did not have notice).

A second factor identified in *Posado* was that the evidence was not being offered before a jury, but in a pretrial hearing before the judge. The court noted that a trial judge is less likely to assign inappropriate evidentiary value to the polygraph evidence based on its scientific validity. *Id.* at 435. However, in this case, plaintiff seeks to introduce the evidence to a jury. This makes the potential for prejudice even greater.

Another factor which enhances the potential for prejudice is that plaintiff's polygraph evidence is probative of her credibility, a central issue in this case. The evidence is offered is "to corroborate her story and to refute defendant's denial." (Plaintiff's Memorandum in Support of Mot. in Limine at 31.) Plaintiff tells one story and defendant, apparently, another. Each may have fallibilities, but essentially it is her word against his. It has been found that the use of the results of a polygraph exam "solely to bolster a witness' credibility is 'highly prejudicial,' especially where credibility issues are central to the verdict." *Sherlin,* 67 F.3d at 1217.

In addition, plaintiff's claim of sexual harassment is a precursor to her constitutional claims. By their nature, the harassment claims could generate a greater emotional reaction, and possible prejudice, than evidence pointed directly to the constitutional claims. Allowing plaintiff to buttress her testimony, purportedly scientifically, could well enhance the striking nature of her sexual harassment complaints to a point of effectively coloring the assessment of the remainder of her evidence.

The questions posed also present problems. Two of the relevant questions are not time nor place specific. This is significant as it is understood that the conduct complained of occurred over a period of time. The relevant questions do not clearly apply to the period of time Arcudi was the First Selectman and indeed plaintiff suggests a course of conduct over a period of time. Therefore, an ambiguity is involved. The truthfulness of an assertion of unwilling participation in an act on one occasion is not determinative of what occurred on another. The truthfulness of a denial of inviting sex at her home would not be determinative of an invitation elsewhere.

The control questions pose greater problems. There is no demonstrated assurance that answers given by plaintiff in response to the two control questions would prompt a substantial physiological reaction. They involve subjective responses. What sex act would necessarily now be considered, by

**590**

plaintiff, as shameful? What plaintiff deems shameful now may not have been deemed so then. There is no assurance there was any such act, or that she would regard a particular sex act as shameful.

The second question has the same subjective vulnerability. What is a "not normal" sex act? Without a definition, what would plaintiff, in answering, deem not normal? Was the intention to inquire as to what is deemed "not normal" now or when committed? If different views prevailed, now and then, would not ambivalence affect the reaction? Measuring her response is subjective in nature, and there is no assurance that her response would be false. Therefore, the control questions create a substantial potential for prejudice as well.

Therefore, even if it were found that plaintiff had demonstrated the admissibility of polygraph evidence under Rule 702, the balancing test of Rule 403 would bar the evidence.

## III. CONCLUSION

The motion in limine to admit polygraph evidence (doc. 79) is **denied.**

SO ORDERED.