UNITED STATES of America,
Plaintiff–Appellee,

v.

Frank Javier CORDOBA, Defendant–Appellant.

No. 98–50082.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 2, 1999.

Decided Nov. 12, 1999.

---

Craig Wilke, Deputy Federal Public Defender, Santa Ana, California, for the defendant-appellant.

Elizabeth R. Abrams, Assistant United States Attorney, Los Angeles, California, for the plaintiff-appellee.

Before: GOODWIN, BRUNETTI, and T.G. NELSON, Circuit Judges.

BRUNETTI, Circuit Judge:

The issue of the admissibility of polygraph evidence has a long and controversial history in the courts. In the wake of the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the question of whether polygraph evidence is reliable enough to be admissible in a trial has once again come into issue. On this, the second appeal in this matter, we must decide whether the district court abused its discretion in finding, after holding an evidentiary hearing, the results of an unstipulated polygraph examination inadmissible under both Federal Rules of Evidence 702 and 403. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I.

Appellant Frank Javier Cordoba was arrested while driving a van which was found to contain 300 kilograms of cocaine and was charged with possession of cocaine with intent to distribute. At trial, Cordoba presented a defense of lack of knowledge. To bolster his credibility, Cordoba sought to admit the results of an unstipulated polygraph exam which supported his contention that he was not aware that the

van he was driving contained cocaine. The district court excluded the evidence, finding that Ninth Circuit precedent made polygraph evidence per se inadmissible. The jury returned a guilty verdict.

On appeal, we reversed, holding that *Daubert*, 509 U.S. 579, 113 S.Ct. 2786, overruled the "'bright line rule' excluding all unstipulated polygraph evidence offered in civil or criminal trials." *United States v. Cordoba*, 104 . F.3d 225, 227 (9th Cir.1996)("*Cordoba I*"). We found that, under *Daubert*, a district court was required to make a particularized factual inquiry into the scientific validity of the proffered polygraph evidence under Rule 702 as well as weigh the probative value of the evidence against its prejudicial effect under Rule 403. *Id.* at 227–28. We remanded with instructions to the district court to "conduct individualized inquires under Rules 702 and 403 to determine whether Cordoba's unstipulated polygraph evidence is admissible." *Id.* at 230. We provided that "[i]f the district court conclude[d] that the unstipulated polygraph evidence [was] inadmissible under Rule 702 or 403, the district court [could] reinstate the judgment of conviction." *Id.*

Upon remand, the district court held a two day evidentiary hearing, received extensive briefing, and reviewed numerous affidavits and reports supplied by the parties. After considering this evidence, the district court found that the polygraph evidence was inadmissible under both Rules 702 and 403. *United States v. Cordoba*, 991 F.Supp. 1199 (C.D.Cal.1998) ("*Cordoba II*"). The district court found that polygraph evidence generally did not meet the reliability standard of *Daubert* and that, due to defects in the test given to Cordoba, "the questionable reliability of the Defendant's polygraph evidence undermines its relevance, and the potential prejudice substantially outweighs its probative value."

*Id.* at 1208. The district court reinstated Cordoba's sentence and this appeal followed.

## II.

■ We review a district court's decision to admit or exclude expert testimony for abuse of discretion. *General Electric Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 517, 139 L.Ed.2d 508 (1997). As an initial matter, Rule 702 assigns the district court "the task of ensuring an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597, 113 S.Ct. 2786. "[I]t is very much a matter of discretion with the [trial] court whether to receive or exclude the evidence" and appellate courts should "not reverse in such a case unless the ruling is manifestly erroneous." *Joiner*, 118 S.Ct. at 517 (quoting *Spring Co. v. Edgar*, 99 U.S. 645, 658, 25 L.Ed. 487 (1878)).

### A. Admissibility of Polygraph Evidence Under Rule 702

#### 1. Rule 702 Analysis

Federal Rule of Evidence 702 allows experts to testify in both opinion form and non-opinion form in order to assist the trier of fact in resolving issues in dispute.[1] In *Daubert*, the Supreme Court found that Rule 702 requires a trial court to make an initial determination, under Federal Rule of Evidence 104(a), whether proffered expert scientific testimony: (1) constitutes scientific knowledge, that (2) "will assist the trier of fact to understand the evidence or to determine a fact in issue." 509 U.S. at 589–91, 113 S.Ct. 2786.

■ The Court enumerated a series of general observations designed to aid trial judges in making initial admissibility determinations. In ascertaining whether proposed testimony is scientific knowledge,

---

1. Rule 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed. R.Evid. 702.

trial judges first must determine if the underlying theory or technique is based on a testable scientific hypothesis. *Id.* at 593, 113 S.Ct. 2786. The second element considers whether others in the scientific community have critiqued the proposed concept and whether such critiques have been published in peer-review journals. *Id.* at 593–94, 113 S.Ct. 2786. Third, the trial judge should consider the known or potential error rate. *Id.* at 594, 113 S.Ct. 2786. Fourth, courts are to consider whether standards to control the technique's operation exist. *Id.* Lastly, the trial court is to appraise whether the relevant scientific community accepts the technique. *Id.* at 594, 113 S.Ct. 2786. The Court instructed that the presence or absence of any single *Daubert* criterion is not to be dispositive in determining the admissibility or inadmissibility of the evidence. *Id.* at 592–93, 113 S.Ct. 2786. To make the determination of whether the testimony would assist the trier of fact, the trial judge must evaluate the relevancy of the evidence.

### 2. Scientific Premises of the Polygraph

Because this is the first case which has required this Court to consider the admissibility of polygraph evidence in the wake of *Daubert* and because aspects of the theoretical underpinnings of polygraph tests are the gravamen of our analysis, we deem it appropriate to begin with a brief background description of the theory behind polygraphy and the test methods most often utilized.[2]

"The polygraph is a device that measures physiological reactions of humans in an attempt to determine the veracity of statements they make." Timothy B. Henseler, *A Critical Look at the Admissibility of Polygraph Evidence in the Wake of Daubert: The Lie Detector Fails the Test,* 46 Cath. U.L.Rev. 1247, 1251 (1997). A polygraph instrument consists of an assortment of instrumentalities that measure the following physiological functions: blood volume, heart rate, respiratory activity, and galvanic skin resistance (palmar sweating). After an examiner attaches the instruments to the subject, any changes in the physiological measurements are transmitted to pens which record them on moving chart paper.

The general hypothesis upon which the theory of polygraphy rests is the notion that when a person lies, the human aversion to lying causes a physiological response which in turn causes an involuntary physiological reaction. A lie is believed to precipitate an alteration in the rate and pattern of breathing, blood pressure, rate and volume of blood flow, and the moisture on the skin. Truthful responses do not precipitate these same reactions.

In the Controlled Question Technique ("CQT"), the test method used most often by polygraph examiners,[3] an examiner asks three different types of questions: neutral, control and relevant. The neutral questions are asked to ascertain the subject's chart readings when answering honestly. The control questions, which are formulated by the examiner and the subject, are designed to be stress inducing. The control questions deal with issues similar to the incident in question, but which are more general. They are worded in such a vague manner that it is difficult for anyone to simply answer "no." The examiner asks the questions in a way that leads the subject to believe that an affirmative answer will affect the examiner's perception of the subject. The control questions

2. For a general discussion of the theoretical basis for the polygraph as well as an evaluation of the validity of the theory, see 1 David L. Faigman, David H. Kaye, Michael J. Saks, & Joseph Sander, Modern Scientific Evidence: The Law and Science of Expert Testimony §§ 14–2.0 to 14–7.0, pp. 565–633 (1997).

3. The test administered here was a Modified General Question Test which is a form of the CQT. The test consisted of four relevant questions, four irrelevant questions, and two control questions.

are designed to elicit an untruthful answer.[4] Finally, the relevant, or incident-specific, questions deal specifically with the crime of which the subject has been accused.[5]

The theoretical underpinning of the CQT is that a person who answers relevant questions truthfully will be more concerned about the broader control questions which they answer falsely. The truthful subject, therefore, will have greater physiological responses to the control questions than to the relevant questions. A deceptive subject, by contrast, will have stronger physical responses to the relevant questions. Thus, the examiner determines whether the subject is answering the relevant questions truthfully by comparing the subject's physiological changes to the relevant and control questions.

### 3. District Court Findings

After holding an evidentiary hearing, considering all the evidence submitted by the parties, and requesting and evaluating additional information, the district court made the following findings:

> The reliability of polygraph testing fundamentally depends on the reliability of the protocol followed during the examination. After considering the evidence and briefing, the court concludes the proposed polygraph evidence is not admissible under Fed.R.Evid. 702. Although capable of testing and subject to peer review, no reliable error rate conclusions are available for real-life polygraph testing. Additionally, there is no general acceptance in the scientific community for the courtroom fact-determinative use proposed here. Finally, there are no reliable and accepted standards controlling polygraphy. Without such standards, there is no way to ensure proper protocol, or measure the reliability of a polygraph examination. Without such standards, the proposed polygraph evidence is inadmissible because it is not based on reliable 'scientific knowledge.'

*Cordoba II*, 991 F.Supp. at 1201–02.

■ Cordoba claims that the district court abused its discretion in finding that polygraph evidence is inadmissible under Rule 702. He avers that the district court misapplied *Daubert* and that its conclusions rested on clearly erroneous findings of fact. Cordoba's argument that the district court applied an erroneous legal standard is premised on the proposition that once a district court finds that a theory is capable of and has been tested and has been subject to peer review, the evidence is admissible as a matter of law under *Daubert*. This argument is without merit. Although the Supreme Court indicated in *Daubert* that these two factors were important to the determination of whether expert scientific testimony is admissible, the Court also stated that "[t]he inquiry envisioned by Rule 702 is, we emphasize, a flexible one." *Daubert*, 509 U.S. at 594, 113 S.Ct. 2786. Because the district court, in making its determination, focused on "the reliability of [the polygraph] as ensured by the scientific validity of its underlying principles," *id.* at 594–95 n. 12, 113

---

**4.** The control questions are usually related to the type of crime that the subject has been accused. Following are the control questions used during Cordoba's exam: "Before 1995, did you ever lie to anyone to benefit yourself?"; and, "Before 1995, did you ever do anything against the law?"

**5.** Cordoba was asked the following relevant questions: "Did you put boxes or anything containing cocaine in the van?"; "Did you know that any of the bags, boxes, or anything in the van contained cocaine?"; "In January 1995, did you agree to posses, distribute, or transport cocaine in the van?"; and, "Before your arrest this year did you know Robert Rodriguez was involved in drug trafficking?" The government claims that only one of these questions was truly relevant. The district court agreed, finding "two [of the supposedly relevant questions] involved undisputed facts, one was marginally relevant, and the wording of the truly relevant question was arguably too ambiguous to be helpful." *Cordoba II*, 991 F.Supp. at 1207.

S.Ct. 2786, it applied the correct legal standard in evaluating the evidence.

Cordoba also avers that the record contains no competent evidence to support the district court's factual findings. We reject this argument as we find the record contains ample evidence to support each of the district court's factual findings.

### a. Testing of the Scientific Hypothesis

The district court found that the scientific hypotheses underlying the polygraph have been subject to both field and laboratory testing. The district court noted that the reliability of both tests have been called into question by critics. Despite these criticisms, the district court found that the polygraph met this requirement. *Cordoba II*, 991 F.Supp. at 1202. The record supports these findings.

### b. Peer Review and Publication

The district court found that "[h]undreds of articles about polygraph have been published, many in peer-reviewed journals. The polygraph appears to meet the peer review factor of the *Daubert* analysis." *Id.* at 1202–03. The district court did not err in making this finding.

### c. Known or Potential Error Rate

■ The district court found, based on the testimony of Cordoba's expert witness, Dr. Raskin, that studies indicate that a properly conducted, high quality CQT examination can have a 5–10% error rate. *Id.* at 1203. The district court determined, however, that the results of these tests were not transferable to real-life exams. Due to the number of variables which can impact the reliability of a particular exam including variations in the particular polygraph examiners' skills, the subjectiveness of the examiner, the susceptibility of the subject to the pressure of the exam, the ability of the subject to control the results

of the exam by employing countermeasures, and the setting of the exam, the district court found that "the error rate of real-life polygraph tests is not known and is not particularly capable of analyzing." *Id.* at 1204.

Although Dr. Raskin testified at the evidentiary hearing that the results of field and laboratory studies establish a low error rate for real-life exams, the district court was not required to accept this testimony.[6] In assessing the known error rate for polygraph exams, the district court properly relied on a study prepared by The United States Congressional Office of Technology Assessment ("OTA") in 1983 in which the OTA evaluated all then available studies on the reliability of polygraph tests. *See* U.S. Congress, Office of Technology Assessment, Scientific Validity of Polygraph Testing: A Research Review and Evaluation–A Technical Memorandum (OTA–TM–H–5, Nov. 1983). The OTA noted in its concluding comment:

> A major reason why scientific debate over polygraph validity yields conflicting conclusions is that the validity of such a complex procedure is difficult to assess and may vary widely from one application to another. The accuracy obtained in one situation or research study may not generalize to different situations or to different types of persons being tested.

*Id.* at 102; *see also id.* at 50 (finding that "because of problems in operationalizing important components of validity, none of the field studies of validity can be taken by itself as an indication of polygraph testing validity."), 56 (noting that the wide variability in accuracy rates across field studies is problematic); 83–90 (discussing variety of factors that can affect the validity of a polygraph exam).

■ The district court also relied on the testimony of the government expert wit-

---

6. The district court noted that Dr. Raskin is one of the leading experts in the field of conducting scientific research on the polygraph technique. *Cordoba II*, 991 F.Supp. at 1201 n. 6.

ness, Special Agent Murphy. In an affidavit, Murphy gave evidence regarding the potential impact that countermeasures can have on the results of a polygraph exam, the difficulties inherent in designing field studies that accurately reflect conditions present in a real life exam, and results of eleven scientific studies which showed a wide range of accuracy rates for polygraph exams. Cordoba claims that the district court erred in relying on Murphy's testimony because Murphy is not qualified to testify on the validity of scientific testing as he is not a trained scientist. Rule 702 provides that an expert may be qualified to testify based on his "knowledge, skill experience, training, or education." Fed. R.Evid. 702. Based on Murphy's experience as the agent in charge of the Federal Bureau of Investigation's polygraph unit and as a provider of quality control review for over 15,000 federal, state, and private polygraph examiners, the district court properly found him to be qualified to testify on the validity of the studies in question. *See Thomas v. Newton International Enterprises,* 42 F.3d 1266, 1269 (9th Cir.1994) (noting that Rule 702 contemplates a broad conception of expert qualifications). The district court did not err in relying on Murphy's testimony.

The reasonableness of the district court's conclusion that there is no known error rate for real-life polygraph exams is bolstered by the Supreme Court's recent assessment of the literature on the validity of polygraph exams. In *United States v. Scheffer,* the Supreme Court found:

> The contentions of respondent and the dissent notwithstanding, there is simply no consensus that polygraph evidence is reliable. To this day, the scientific community remains extremely polarized about the reliability of polygraph techniques. 1 D. Faigman, D. Kaye, M. Saks, & J. Sander, Modern Scientific Evidence, 565 n. 14–2.0, and § 14–3.0 (1997); *see also* 1 P. Giannelli & E. Imwinkelried, Scientific Evidence § 8–2(C), pp. 225–227 (2d ed.1993) ...; 1 J. Strong, McCormick on Evidence § 206, p. 909 (4th ed. 1992).... Some studies have concluded that polygraph tests overall are accurate and reliable. *See, e.g.,* S. Abrams, The Complete Polygraph Handbook 190–91 (1968) (reporting the overall accuracy rate from laboratory studies involving the common 'control question technique' polygraph to be 'in the range of 87 percent'). Others have found that polygraph tests assess truthfulness significantly less accurately- that scientific field studies suggest the accuracy rate of the 'control question technique' polygraph is 'little better than could be obtained by the toss of a coin,' that is, 50 percent. *See* Iacono & Lykken, *The Scientific Status of Research on Polygraph Techniques: The Case Against Polygraph Tests* in 1 Modern Scientific Evidence, *supra,* § 14–5.3, p. 629.

523 U.S. 303, 118 S.Ct. 1261, 1265, 140 L.Ed.2d 413 (1998).

The district court did not err in basing its conclusions in part on the same learned treatises upon which the Supreme Court relied in *Scheffer* or in reaching the same conclusion as the Supreme Court.

### d. General Acceptance in the Scientific Community

To demonstrate that the polygraph technique enjoys widespread acceptance in the relevant scientific community, Cordoba submitted to the district court three surveys which purport to show that two-thirds of the members of the Society of Psychophysiological Research view polygraph exams as reliable. The district court found that this evidence did not show that polygraph exams met the general acceptance test. The district court first noted that the surveys only sampled a small segment of the relevant scientific community. *Cordoba II,* 991 F.Supp. at 1204; *see also United States v. Pitner,* 969 F.Supp. 1246, 1251 (W.D.Wash.1997) (noting that polygraph expert admitted on cross examination that the relevant scientific community

for the purpose of determining the general acceptance of polygraph to some degree includes psychiatrists, neuroscientists, and medical doctors). Second, and more importantly, the district court found that the survey results did not indicate that the individuals polled viewed the results of polygraph exams to be sufficiently reliable to be used as evidence in a trial. *Cordoba II*, 991 F.Supp. at 1204. The surveys only show that sixty-two percent of the respondents indicated that they viewed the polygraph as "a useful diagnostic tool when considered with other available information." *Id.* at 1204 n. 16.

In finding that the relevant scientific community did not generally accept polygraph exams as being sufficiently reliable to be used as evidence in a trial, the district court also relied on a scholarly treatise which found that "[s]cientific opinion about the validity of polygraph techniques is extremely polarized." *Id.* at 1205 (citing 1 D. Faigman, et al., Modern Scientific Evidence § 14–1.4, at 565). The district court further found persuasive the testimony of Special Agent Murphy that "[i]n 1986, the American Psychological Association adopted a policy which called the reliability of polygraph test results 'unsatisfactory.' " *Id.* Finally, the district court noted that the District Court for the District of Connecticut, in finding the results of a CQT polygraph exam inadmissible, referenced the existence of two additional studies that indicated that only thirty-six percent of the relevant community agreed that CQT exams were scientifically sound.[7] *Id.* (citing *Meyers v. Arcudi*, 947 F.Supp. 581, 587 (D.Conn.1996)). The district court did not abuse its discretion in finding that this factor weighed against the admission of polygraph evidence under Rule 702.

### e. Controlling Standards

■ In response to a request from the district court, the parties submitted information regarding the existence of controlling standards for a CQT polygraph exam. To determine if adequate standards existed, the district court reviewed the following sources:

the American Association of Police Polygraphists List of Generalized Terminology and Procedure ('AAPP List'), the American Polygraph Association Code of Ethics Standards and Principles of Practice ('APA Code'), the Federal Bureau of Investigations' Manual chapter on conducting polygraph examinations ('FBI' Manual), the California Association of Polygraph Examiners Standards and Principles of Practice ('CAPE Standards'), New Mexico Evidence Code § 11–707, and Department of Defense Polygraph Institute ('DoDPI') Regulations.

*Cordoba II*, 991 F.Supp. at 1205.

The district court found that there are no standards which control the procedures used in the polygraph industry and that without such standards a court can not adequately evaluate the reliability of a particular polygraph exam. *Id.* at 1205–07. A review of the relevant literature supports the district court's findings. For example, under the DoDPI regulations, if a subject fails one question, the subject cannot pass the test. Dr. Raskin testified, however, that he does not follow the DoDPI's procedure in this regard. Under Dr. Raskin's procedure, a subject could pass an exam despite the fact that he failed one question. Similarly, although results from a polygraph are inadmissible under the New Mexico Rules of Evidence unless the exam is recorded, Dr. Raskin testified that in his view a recording is not required to ensure that a test is unbiased and that

---

**7.** Cordoba objects to the district court's reliance on *Meyers* because the *Meyers* court did not cite the studies themselves but only referred to the fact that an expert had testified to the existence of the studies. We find this distinction to be without import. The district court here only relied on the discussion contained in the *Meyers* opinion as an indication that there exists a great deal of controversy regarding the level of acceptance that polygraph evidence enjoys in the scientific community. We find such reliance proper.

results from an unrecorded exam should be admissible. Dr. Raskin opined that a recording was only necessary if there were indicia that an exam was not properly conducted.

Cordoba's claim that there are standards which control the industry is significantly undercut by Dr. Raskin's evaluation at the evidentiary hearing of the exam given to Cordoba. The government offered persuasive evidence that Cordoba's exam was defective in that it deviated from the industry "standards" in several significant ways. Based on this evidence, the district court found:

> Defendant's test contained many factors which would be considered defects under various versions of the industry 'standards.' The duration and substance of the pre-test interview was not preserved. No tape or video was made of the pre-test interview or the polygraph exam. The examiner didn't calibrate the machine at the prison test site. Although the examiner asked four supposedly 'relevant questions,' only one was really relevant: two involved undisputed facts, one was marginally relevant, and the wording of the truly relevant question was arguably too ambiguous to be helpful. The examiner found deception in the marginally-relevant question's answer (while Dr. Raskin did not), but the examiner scored it as truthful after obtaining Defendant's explanation for the answer. The examiner's report was filled with errors and defects: the report was drafted before the test, it did not include a fingertip test, according to Dr. Raskin it lacked attention to detail, it omitted Defendant's response to whether he was under drugs or medication, it misstated the machine used, and it says the stimulation test was done after the first test when it was actually done first. Although there was movement on a response, the examiner scored the response. The examiner did not record a significant breath. The examiner did not ask if Defendant had proper sleep

before the exam. The examiner acknowledged the exam was conducted in a poor setting with many distractions. *Cordoba II,* 991 F.Supp. at 1207.

Despite the occurrence of all these deviations from the purportedly controlling standards, Dr. Raskin testified that the exam in question was sufficiently reliable to be admitted at trial. He acknowledged many of the irregularities delineated above but found that they were not significant. The district court found that Dr. Raskin's approval of this obviously defective test illustrated that the industry did not have sufficient controlling standards to allow for the admission of polygraph evidence into court. The district court concluded "[i]f pro-polygraph's best expert declines to find any fault with an obviously faulty examination, that is strong evidence that there are insufficient controlling standards." *Id.* As the record supports the district court's factual findings regarding Cordoba's exam, the district court did not err in concluding that the polygraph industry lacks controlling standards.

■ In view of the evidence offered by the government at the evidentiary hearing regarding the lack of a known error rate for real life polygraph exams, the controversy in the relevant scientific community regarding the validity of the theoretical basis for the polygraph, and the paucity of controlling standards, the district court did not abuse its discretion in finding that polygraph evidence is inadmissible under Rule 702 and *Daubert. Cf. United States v. Crumby,* 895 F.Supp. 1354 (D.Ariz.1995) (finding polygraph evidence admissible under Rule 702 where the government did not offer any expert testimony regarding the validity of the theoretical basis for the polygraph nor contest Dr. Raskin's testimony regarding the known error rate).

### B. Rule 403 Analysis

■ If polygraph evidence is found to generally meet the requirements of Rule 702, a district court may nevertheless exclude the results of a particular poly-

graph exam if it finds that the probative value of the evidence is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed.R.Evid. 403; *see also Cordoba I*, 104 F.3d at 228. "The Rule 403 weighing process-that of balancing the probative value of the proffered evidence against its potential for unfair prejudice or confusion of issues-is primarily for the district court to perform." *United States v. Layton*, 767 F.2d 549, 553 (9th Cir.1985); *see also United States v. Rincon*, 28 F.3d 921, 925 (9th Cir.), *cert. denied*, 513 U.S. 1029, 115 S.Ct. 605, 130 L.Ed.2d 516 (1994). We review the district court's decision to exclude polygraph evidence under Rule 403 with "considerable deference." *United States v. Layton*, 855 F.2d 1388, 1402 (9th Cir.1988).

■ As discussed above, the district court found that the polygraph test administered to Cordoba was defective in several significant respects. *Cordoba II*, 991 F.Supp. at 1207. It noted that the admission of Cordoba's defective polygraph evidence ran a substantial risk of unfairly prejudicing the jury because it was being offered to bolster Cordoba's credibility. *Id.* at 1208; *see also United States v. Sherlin*, 67 F.3d 1208, 1217 (6th Cir.1995) (finding that a district court did not abuse its discretion in excluding unstipulated polygraph evidence under Rule 403 because the danger of unfair prejudice resulting from the use of an unstipulated polygraph exam to bolster the credibility of a witness substantially outweighed the probative value of such evidence). It concluded that the risks associated with admitting evidence of a flawed exam greatly outweighed the probative value of such evidence and that therefore the evidence was inadmissible pursuant to Rule 403. The district court did not abuse its discretion in so finding. *See United States v. Kwong*, 69 F.3d 663, 668 (2d Cir.1995) (upholding a district court's determination that the results of a defective polygraph exam were inadmissible under Rule 403);

*see also Scheffer*, 118 S.Ct. at 1267 (noting that "the aura of infallibility attending polygraph evidence can lead jurors to abandon their duty to assess credibility and guilty" and may unduly influence a jury); *Cordoba I*, 104 F.3d at 228 (commenting upon the "inherent problematic nature" of polygraph evidence and noting that "polygraph evidence has grave potential for interfering with the deliberative process").

### III.

The district court conducted a thorough and careful evaluation of all the proffered evidence regarding the reliability of polygraph evidence. On the basis of this evidence, the district court did not abuse its discretion in finding that "polygraph evidence does not presently satisfy the *Daubert* standards" and that Cordoba's polygraph evidence was therefore inadmissible under Rule 702. The district court also did not abuse its discretion in finding that the probative value of Cordoba's flawed polygraph exam did not outweigh the substantial risk of unfair prejudice that might result from admitting such evidence.

**AFFIRMED.**

GOODWIN, Circuit Judge, Concurring separately:

While I agree fully that the district court correctly excluded the so-called expert testimony with which the defendant hoped to help his testimonial oath by informing the jury that he had passed a polygraph test, I do not believe it was necessary for five judges of this court to expend upon this question the time and resources reflected in the two opinions which have been produced in response to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

Had I been a member of the panel that considered the first appeal in this case, back in 1996, I probably would have voted to affirm the exclusion of the polygraph

evidence under Federal Rules of Evidence 403. However, three able and experienced judges of this court reversed and remanded for an evidentiary hearing under *Daubert,* and I have no serious quarrel with that decision. What I do question, however, is the growing frequency with which panels of our court decline the opportunity to hear the second appeal after the panel has remanded the case to the district court. The clerk's office queries the original panel and offers the "comeback case" to the panel that decided the first appeal. In most cases, no harm is done when the panel declines the case and allows it to be assigned to another three-judge panel, randomly drawn pursuant to our internal rules. However, when the remand is for a narrow and specific purpose, a great savings in time and energy can be accomplished if the panel remanding the case reviews the district court's work product after the remand. When the panel declines to review the work product, a whole new learning curve has to be developed by three new judges who have no knowledge of the case. This is the sort of inefficiency that would not be tolerated in private industry. I firmly believe the panel that wrote the opinion in *United States v. Cordoba,* 104 F.3d 225 (9th Cir.1997) should have accepted the narrow question which came up on this second appeal, and could have affirmed the case easily on the briefs, without reassembling for oral arguments, and gone on to more important work.

My second problem is that the Rule 702 portion of this long, scholarly, and probably correct second opinion on the *Daubert* question in this unremarkable case is largely unnecessary. Rule 403 is ample authority for affirming the trial court. Moreover, commonsense is ample authority for affirming. An unstipulated polygraph printout, before *Daubert* or after *Daubert,* is not worth the paper wasted on it. A defendant, unknown to anyone, can shop around and keep taking polygraph "tests" until he or she passes one, and then triumphantly march into court and tender it as evidence that a lifetime of mendacity

has been overcome, and that for once this defendant must be telling the truth. I would rest the result in this case on Rule 403 and the commonsense of the able trial judge and get back to the more difficult work that awaits all of us. That said, I have no basis for disagreeing with the scholarship reflected in the majority opinion. I just think we took on some unnecessary work.